UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| HOMER EARP, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 5:18-cv-325-GMB |
| | ) |
| ANDREW M. SAUL,[1] Commissioner, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION AND ORDER**

On June 25, 2015, Plaintiff Homer Earp, Jr. filed an application for disability insurance benefits. His alleged disability onset date is May 18, 2015. Earp's application for benefits was denied at the initial administrative level. Earp then requested a hearing before an Administrative Law Judge ("ALJ"). The ALJ held a hearing on March 1, 2017, and he denied Earp's claims on June 1, 2017. Earp requested a review of the ALJ's decision by the Appeals Council, which declined review on January 4, 2018. As a result, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration (the "Commissioner") as of January 4, 2018.

---

[1] Andrew M. Saul became the Commissioner of Social Security on June 5, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Saul is substituted for Nancy Berryhill as the proper defendant in this case.

Earp's case is now before the court for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Under 28 U.S.C. § 636(c)(1) and Rule 73 of the Federal Rules of Civil Procedure, the parties have consented to the full jurisdiction of a United States Magistrate Judge.  Based on a careful review of the parties' submissions, the relevant law, and the record as a whole, the court concludes that the decision of the Commissioner is due to be AFFIRMED.

## I.  STANDARD OF REVIEW

The court reviews a Social Security appeal to determine whether the Commissioner's decision "is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997). The court will reverse the Commissioner's decision if it is convinced that the decision was not supported by substantial evidence or that the proper legal standards were not applied. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  The court "may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner," but rather "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (citation and internal quotation marks omitted). "Even if the evidence preponderates against the Secretary's factual findings, [the court] must affirm if the decision reached is supported by substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  Moreover, reversal is not

warranted even if the court itself would have reached a result contrary to that of the factfinder. *See Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

The substantial evidence standard is met "if a reasonable person would accept the evidence in the record as adequate to support the challenged conclusion." *Holladay v. Bowen*, 848 F.2d 1206, 1208 (11th Cir. 1988) (quoting *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983)). The requisite evidentiary showing has been described as "more than a scintilla, but less than a preponderance." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The court must scrutinize the entire record to determine the reasonableness of the decision reached and cannot "act as [an] automaton[] in reviewing the [Commissioner's] decision." *Hale v. Bowen*, 831 F.2d 1007, 1010 (11th Cir. 1987). Thus, the court must consider evidence both favorable and unfavorable to the Commissioner's decision. *Swindle v. Sullivan*, 914 F.2d 222, 225 (11th Cir. 1990).

The court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Grant v. Astrue*, 255 F. App'x 374, 375–76 (11th Cir. 2007) (citing *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994)). There is no presumption that the Commissioner's conclusions of law are valid. *Id.*

## II. STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 416(i). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). Earp bears the burden of proving that he is disabled, and is responsible for producing evidence sufficient to support his claim. *See Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

A determination of disability under the Social Security Act requires a five-step analysis. 20 C.F.R. § 404.1520(a). The Commissioner must determine in sequence:

(1) Is the claimant presently unable to engage in substantial gainful activity?
(2) Are the claimant's impairments severe?
(3) Do the claimant's impairments satisfy or medically equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the claimant unable to perform her former occupation?
(5) Is the claimant unable to perform other work given her residual functional capacity, age, education, and work experience?

*See Frame v. Comm'r, Soc. Sec. Admin.*, 596 F. App'x 908, 910 (11th Cir. 2015).

"An affirmative answer to any of the above questions leads either to the next question, or, [at] steps three and five, to a finding of disability. A negative answer to any question, other than at step three, leads to a determination of 'not disabled.'" *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986) (quoting 20 C.F.R. § 416.920(a)−(f)). "Once the finding is made that a claimant cannot return to prior work the burden of proof shifts to the Secretary to show other work the claimant can do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citing *Gibson v. Heckler*, 762 F.2d 1516 (11th Cir. 1985)).

## III. FACTUAL BACKGROUND

Earp was 40 years old at the time of the ALJ's decision. R. 37. He lives with his son and a roommate in Decatur, Alabama. R. 43 & 135. His primary complaint is chronic venous insufficiency. On his application for disability benefits, he alleged that nephrolithiasis, peripheral vascular disease, sick sinus syndrome, and varicose veins of lower extremities prevented him from working. R. 171.

Earp completed high school, some vocational training, and one year of college. R. 37. He worked as a machine operator at General Electric for almost 15 years, from 1999 until 2015. R. 38 & 171–72. His last employment ended on May 18, 2015. R. 171. He has not engaged in any substantial gainful activity since that date. R. 12.

The ALJ held a hearing in Earp's case on March 1, 2017. R. 33. At the

hearing, Earp testified that his average pain level is 5 on a scale from 1 to 10. R. 40. He also testified that he suffers two bad days per week. R. 40–41. Earp defined "bad days" as those where he could not stand and his pain level was 9.5. R. 40. Earp said that generally he could stand on his feet for one hour without needing to sit down and rest. R. 41. He testified that he can lift at least 10 to 15 pounds regularly, and perhaps even 20 or 25 pounds. R. 42.

Earp's treating physician, Dr. Punuru J. Reddy, opined that Earp had been medically disabled since November 2014 for an indefinite period of time. R. 17. He reported that Earp could work for a maximum of zero hours per day, and he determined that Earp could lift only 5 pounds occasionally. 17. Dr. Reddy further opined that Earp "could occasionally sit, stand, walk, bend, stoop, twist, crouch, squat, kneel, crawl, climb, balance, reach, repetitively use his hands for gross dexterity and do fingering for fine dexterity, and flex or extend his neck." R. 17. Dr. Reddy suggested that Earp was able to operate motor vehicles, but should not be around machines, chemicals, electricals, or unprotected heights. R. 17.

During the hearing, the ALJ posed the following hypothetical to a vocational expert ("VE"):

> I would ask you to assume a hypothetical individual [of] the claimant's age and education with the past job you described. Further assume that the individual is limited to perform work at the sedentary exertional level with additional restrictions as follows. Could occasionally climb, frequently kneel, crouch and crawl, and should avoid all exposure to hazards such as unprotected heights and dangerous moving machinery.

R. 49. The ALJ asked whether this individual could perform the work Earp did at General Electric, and the VE responded, "No." R. 49. The ALJ then asked whether this hypothetical individual could perform any work at all in the national economy. R. 49. The VE determined that this individual could find sedentary work. [2] R. 50. For example, the VE determined that the individual could work as a sealer, a table worker, or an order clerk. R. 50. The VE also testified that an individual who could be expected to miss more than two days a month on a consistent basis would be unable to find work in the national economy due to excessive absenteeism. R. 50.

The ALJ issued his decision on June 1, 2017. R. 19. He found that Earp suffers from the severe impairment of chronic venous insufficiency under 20 C.F.R. § 404.1520(c). R. 12. The ALJ noted that chronic venous insufficiency significantly limits an individual's ability to perform basis work activities in accordance with the Social Security rules and regulations. R. 12. But the ALJ concluded at step three of the analysis that Earp's impairment did not satisfy or medically equal the severity of one of those listed in the applicable regulations. R. 13. "Listing 4.11 considers chronic venous insufficiency and requires either extensive brawny edema . . . or superficial varicosities, stasis dermatitis, and either recurrent ulceration or persistent

---

[2] Sedentary work involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

ulceration that has not healed following at least 3 months of prescribed treatment."

R. 13 (internal citations and quotations omitted).

At steps four and five, the ALJ found that Earp has the residual functional

capacity ("RFC") to perform a full range of sedentary work. R. 28. In making this

RFC determination, the ALJ concluded that Earp's "statements concerning the

intensity, persistence and limiting effects of [his] symptoms [were] not entirely

consistent with the medical evidence." R. 14. The ALJ noted that while Earp did

have chronic venous insufficiency, he received beneficial treatment for this

impairment, and "each procedure was considered successful, the claimant reported

some improvement in his symptoms, and there was also a decrease in abnormal

clinical examination findings." R. 14.

The ALJ assigned little weight to Dr. Reddy's opinion and conclusions about

Earp's inability to work when determining Earp's RFC because

>an opinion as to whether a claimant is disabled or unable to work as
>defined by the regulations speaks to an issue for the Commissioner.
>Reddy's statements . . . are not supported by clinical examination
>findings by Dr. Reddy or other treatment providers, which were
>generally normal except for the presence of varicose veins and "trace"
>edema in the lower extremities. As noted above, even Dr. Reddy once
>noted that the examination findings were unremarkable. Additionally,
>it is internally inconsistent for Dr. Reddy to indicate that the claimant
>is capable of performing physical work-related activities on an
>occasional basis and to simultaneously indicate that he could not work
>for any number of hours in a day or even in a week. It is also
>significant that the claimant himself testified that he can lift and carry
>more than 5 pounds suggested by Dr. Reddy, and that he testified that
>his upper body is "decent," which does not support Dr. Reddy's

limitations on his ability to reach or use his hands or fingers.
R. 17.

Ultimately, the ALJ determined that Earp is unable to perform any past relevant work, but considering Earp's age, education, work experience, and RFC he found that there are jobs Earp can perform that exist in significant numbers in the national economy. R. 18. Therefore, the ALJ concluded that Earp is not disabled within the meaning of the Social Security Act. R. 19. Based on these findings, the ALJ denied Earp's claims. R. 19.

## IV. DISCUSSION

Earp presents two issues on appeal: (1) whether the ALJ properly applied the Eleventh Circuit pain standard in evaluating Earp's credibility, and (2) whether the ALJ failed to articulate good cause for according less weight to the opinion of Earp's treating physician.

### A.    The Pain Standard

Earp asserts that the ALJ erred in assessing the credibility of his pain allegations. Doc. 16. When determining the credibility of a claimant's testimony as to his symptoms, the ALJ must follow a two-step process: "(1) first determine if the claimant has a medically determinable impairment that could reasonably be expected to produce the symptoms alleged; and, if so (2) evaluate the intensity and persistence of the claimant's symptoms such as pain and determine the extent to which the

claimant's symptoms limit his or her ability to perform work-related activities." *Cooley v. Comm'r of Soc. Sec.*, 2019 WL 211437, at *2 (M.D. Fla. Jan. 16, 2019). "In considering the intensity, persistence, and limiting effects of the claimant's symptoms, the ALJ is to examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *3 (internal citation and quotation omitted).

Additionally, the Social Security Regulations provide that a claimant's subjective complaints of pain cannot alone establish disability. Rather, the regulations describe additional objective evidence that permits a finding of disability. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529. Interpreting these regulations, the Eleventh Circuit has articulated a "pain standard" that applies when a claimant attempts to establish disability through his own testimony of pain or other subjective symptoms. When establishing disability in this manner, a claimant must satisfy two parts of the Eleventh Circuit's three-part pain standard: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).

A claimant's testimony that is supported by medical evidence and satisfies the pain standard "is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). But an ALJ is free to discredit a claimant's testimony. *See Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005); *Crow v. Colvin*, 36 F. Supp. 3d 1255, 1259 (N.D. Ala. 2014) ("Therefore, if a claimant testifies to disabling pain and satisfies the three part pain standard, the ALJ must find a disability unless the ALJ properly discredits the claimant's testimony."). "If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.2d at 1255. Otherwise, the testimony will be accepted as true. *Id.* The pain standard requires that the articulated reasons be supported by substantial evidence. *Hale*, 831 F.2d at 1012 ("Implicit in this rule is the requirement that such articulation of reasons by the Secretary be supported by substantial evidence."). In any event, the "question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

Here, the ALJ's articulated reason for discounting Earp's pain allegations is supported by substantial evidence because, even though Earp does suffer from chronic venous insufficiency, the medical records do not support the severity of pain he claims and also reveal that his condition improves with treatment.

Earp first met with Dr. Punuru J. Reddy on October 8, 2012. R. 307. Dr. Reddy reported that Earp had varicose veins and had undergone related surgery in the past. R. 305. However, Earp did not complain of pain on that first encounter, and Dr. Reddy did not observe any problems with his vessels or extremities. R. 306–07. Earp met with Dr. Reddy again on October 15, 2012. The varicose veins were still present, but Dr. Reddy did not notice any associated problems and recorded that vein stripping procedures had improved Earp's veins. R. 300–04. A visit in April 2013 revealed similar findings. R. 298. During these visits, there was no discussion of the need for a treatment plan for Earp's varicose veins.

In early September 2013, Earp met again with Dr. Reddy, and the examination did not reveal any problems with his varicose veins. R. 294–96. But on September 25, 2013, Earp began to complain about leg pain. R. 291. Earp reported that he had leg cramps while working at the General Electric plant. R. 291. Dr. Reddy sent him for a consultation with Madison Vein Center Specialists, and excused Earp from walking at work until he was evaluated. R. 293. In January 2014, Earp again complained of leg cramps and being unable to stand at work. R. 288. Dr. Reddy excused him from walking at work until he could be evaluated. R. 290.

In July 2014, Earp again complained of leg pain. R. 280. Dr. Reddy observed that Earp had significant varicose veins in his left leg, and he recommended compression stockings. R. 280. By September 30, 2014, Earp reported no

complaints apart from constant fatigue. R. 273.  Though his varicose veins were still present, Dr. Reddy recorded no abnormalities of his vessels or extremities. R. 274. At a follow-up visit two weeks later, Earp complained of leg pain but Dr. Reddy did not note any vessel or extremities abnormalities. R. 269 & 272.  At the next visit with Dr. Reddy, in November 2014, Earp reported that he was feeling much better. R. 262.

However, in March 2015, while meeting with Dr. Michael Ridner at the Vein Center Clinic in the Huntsville Hospital, Earp complained about dilated and painful varicose branches. R. 315.  Earp noted that his job required him to be on his feet for extended periods of time, which caused his varicose veins to become tender and painful. R. 315.  Dr. Reddy observed that it had been two years since Earp received any treatment for his legs and agreed to schedule Earp for a phlebectomy. R. 315 & 345.

By May 2015, Earp was back in Dr. Reddy's office complaining of leg pain. R. 256.  Dr. Reddy observed varicose veins in the left leg. R. 256.  Earp stated that he could not walk because of the pain, and Dr. Reddy noted that the compression stockings provided no relief. R. 256–57.  Around this time, Earp also began his treatment with Dr. Ridner. R. 256.  On June 8, 2015—a few weeks after the alleged disability onset date—Dr. Ridner inserted stents in Earp's legs with "an excellent result." R. 256, 310 & 502.  Despite some lingering symptoms, Earp's condition

generally improved after this procedure.

Later that month, on June 18, 2015, tests revealed that Earp's right leg was doing well but that he had deep vein thrombosis in his left leg. R. 374–76. In July, Earp reported that his legs were feeling less fatigued and that any soreness remaining from the stenting procedure was improving. R. 370. He was able to exercise by walking twice per week. R. 370. Due to the pain in his left leg, Earp met with physician assistant Heather Payne at the Heart Center on August 14, 2014. R. 286 & 507. While at the Heart Center, Earp reported that he did have pain in his left leg, but that the recent stenting for compression "helped his legs feel better." R. 386 & 389. He still was able to walk twice per week for exercise. R. 385. On a scale of 1 to 10, Earp reported that his pain was a level 2. R. 386. Despite compression stockings and elevation of the leg, the pain in his leg still persisted. R. 507. Dr. Payne suggested Earp should schedule an ablation of the left smaller saphenous vein. R. 385 & 507.

The next month, Earp underwent the suggested ablation on his left small saphenous vein. R. 497. Dr. Ridner found that the vessel completely closed with no evidence of deep vein thrombus. R. 497. Earp reported that he had no complications and that his leg was feeling much better. R. 498. Earp also indicated that he exercised by walking three times per week. R. 498.

In November 2015, Earp underwent an ablation procedure on his right left.

R. 493.  Dr. Ridner noted that the ablation was successful and resulted in a complete closure of Earp's saphenous vein with no evidence of deep vein thrombus. R. 493. A study completed that same day revealed that Earp's vessels compressed well. R. 537.  Dr. Ridner did note that Earp continued to have varicosities which became painful, but only if he was on his feet for an extended length of time. R. 493.

At another visit in January 2016, Dr. Ridner noted that Earp still had painful and dilated varicose branches. R. 488.  A study that month also indicated that Earp did not have deep vein thrombosis, but he did have significant venous reflux. R. 535. Earp reported that the pain occurred after he was on his feet during the work day. R. 488.  Additionally, Dr. Ridner reported that Earp "continues to do very well" and exercises by walking three times per week. R. 488.

Earp later underwent a successful phlebectomy, and testing in May 2016 revealed no evidence of deep vein thrombosis. R. 534.  Testing in June 2016 confirmed that Earp was negative for superficial and deep vein thrombosis in both of his legs. R. 532–33.

In September 2016, Earp saw his treating physician Dr. Reddy about a cough and congestion. R. 555.  He denied any other complaints and reported that he had no swelling in his legs even though his varicose veins were present. R. 555.

On November 17, 2016, Earp met with Dr. Ridner after a referral from Dr. Reddy for complaints of varicose veins and venous compression. R. 639.  Dr. Ridner

noted that all follow-up studies after stenting in June 2015 documented patency with no sign of thrombus. R. 640. Additionally, the week prior to the November 17 visit, Earp underwent sclerotherapy and phlebectomy on his right leg. R. 640. Dr. Ridner reported that the procedure was uncomplicated, and an ultrasound revealed no deep vein thrombus and wide patency of the stents. R. 640. Earp was instructed to maintain a low-dose aspirin treatment. R. 640.

The ALJ articulated his reason for discounting Earp's statements concerning the intensity, persistence, and limiting effects of his pain: his allegations were "not entirely consistent with the medical evidence and other evidence in the record." R. 14. That reason is supported by substantial evidence. Although Earp does suffer from chronic venous insufficiency, the medical evidence detailed above demonstrates that treatment improves Earp's condition, that Earp's condition does not satisfy the listing, and that he is therefore able to work. Listing 4.11 requires that a claimant suffer from extensive brawny edema or superficial varicosities, stasis dermatitis, and either recurrent ulceration or persistent ulceration that has not healed following at least three months of prescribed treatment. Apart from the compression stockings, the record reflects that treatment consistently improved Earp's condition. Following his alleged disability onset date, Earp never suffered from recurrent ulceration or persistent ulceration following three months of prescribed treatment. Instead, Earp's symptoms were often relieved within less than three months of

treatment. For example, Earp's legs felt better within approximately two months after stenting in 2015. R. 386 & 389. Earp's legs did not show any signs of thrombus after this stenting. R. 640. Immediately following an ablation in November 2015, Earp's saphenous vein was completely closed and his vessels began to compress well. R. 493. Additionally, within a week of sclerotherapy and a phlebectomy performed in November 2016, studies revealed no deep vein thrombus. R. 640. This substantial evidence supports the ALJ's decision to discredit Earp's allegations that the intensity, persistence, and limiting effects of his pain prevent him from working.[3]

## B.    Dr. Reddy's Opinion

Earp argues that the ALJ erred in assigning little weight to Dr. Reddy's opinion. Doc. 16 at 11. "In evaluating medical opinions, the ALJ considers many factors, including the examining relationship, the treatment relationship, whether the opinion is amply supported, whether the opinion is consistent with the record and the doctor's specialization." *Kelly v. Comm'r of Soc. Sec.*, 401 F. App'x 403, 407 (11th Cir. 2010) (citing 20 C.F.R. §§ 404.1527(d) & 416.927(d)). The opinions of examining physicians are given more weight than those of non-examining physicians, and the opinions of treating physicians are given substantial weight

---

[3] Additionally, the medical records and Earp's testimony at the hearing before the ALJ indicate that Earp most often experiences pain while on his feet for a significant length of time. While this pain may have manifested itself frequently in Earp's recent employment, and may prevent him from performing past relevant work, this pain would be a minimal concern if Earp complies with the ALJ's limitation to sedentary work.

unless the ALJ shows good cause for not doing so. *See id.* "The opinions of non-examining, non-reviewing physicians, are entitled to little weight when contrary to those of an examining physician, and taken alone, they do not constitute substantial evidence." *Forrester v. Comm'r of Soc. Sec.*, 455 F. App'x 899, 901 (11th Cir. 2012). But the "ALJ is not allowed to make medical findings or indulge in unfounded hunches about the claimant's medical condition." *Smith v. Astrue*, 641 F. Supp. 2d 1229, 1233 (N.D. Ala. 2009). In any event, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence. *Id.* (internal citation omitted). The court cannot affirm the ALJ's decision "simply because some rationale might have supported the ALJ's conclusion." *Id.* (internal citation omitted). However, "the ultimate determination of disability is reserved for the ALJ." *Green v. Soc. Sec. Admin.*, 223 F. App'x 915, 923 (11th Cir. 2007); *see also Harris v. Astrue*, 546 F. Supp. 2d 1267, 1281 (N.D. Fla. 2008) ("The Commissioner's regulations and the interpretations of those regulations clearly provide that an ALJ should give weight to a physician's opinions concerning the nature and severity of a claimant's impairments, but that the ultimate question of whether there is disability or inability to work is reserved to the Commissioner.")

Here, it was appropriate for the ALJ to assign Dr. Reddy's opinion little weight. As an initial matter, the ALJ was not required to give any weight to Dr. Reddy's opinion that Earp is unable to work because that is a decision reserved for the Commissioner. *See Harris*, 546 F. Supp. 2d at 1281 ("The opinion by a treating physician that a patient is 'unable to work' or is 'disabled' is not dispositive for purposes of Social Security claims.").

In addition, substantial evidence supports the ALJ's decision to assign little weight to Dr. Reddy's opinions regarding Earp's general abilities and limitations. Dr. Reddy opined that Earp had been medically disabled since November 2014 for an indefinite period of time. R. 17. He reported that Earp could work for a maximum of zero hours per day. R. 17. And he determined that Earp could lift only 5 pounds occasionally. 17. Dr. Reddy further opined that Earp could only "occasionally sit, stand, walk, bend, stoop, twist, crouch, squat, kneel, crawl, climb, balance, reach, repetitively use his hands for gross dexterity and do fingering for fine dexterity, and flex or extend his neck." R. 17. He suggested that Earp was able to operate motor vehicles, but should not be around machines, chemicals, electricals, or unprotected heights. R. 17.

The ALJ found this opinion to be worthy of little weight because

Reddy's statements . . . are not supported by clinical examination findings by Dr. Reddy or other treatment providers, which were generally normal except for the presence of varicose veins and "trace" edema in the lower extremities. As noted above, even Dr. Reddy once

noted that the examination findings were unremarkable. Additionally, it is internally inconsistent for Dr. Reddy to indicate that the claimant is capable of performing physical work-related activities on an occasional basis and to simultaneously indicate that he could not work for any number of hours in a day or even in a week. It is also significant that the claimant himself testified that he can lift and carry more than 5 pounds suggested by Dr. Reddy, and that he testified that his upper body is "decent," which does not support Dr. Reddy's limitations on his ability to reach or use his hands or fingers.

R. 17.

There is substantial evidence supporting these findings. Earp did contradict Dr. Reddy when he testified that he could lift more than five pounds. R. 42. If edema was present, it was a trace amount, not extensive and brawny as required by the listing. R. 257, 260, 278 & 488. And nothing in Earp's medical records indicates that he has trouble pushing and pulling, bending, stooping, sitting, twisting, crouching, squatting, kneeling, crawling, climbing, balancing, reaching, and flexing or extending his neck. Earp's medical records do not reveal problems with dexterity or fingering. When meeting with doctors, Earp did not voice complaints about being limited in these categories, and the doctors did not record such limitations. Though Earp has problems standing and walking for extended periods of time, he testified that he can stand for an hour without resting (R. 42), and the medical records reveal that he walks for exercise. R. 370, 385 & 490. Accordingly, substantial evidence supports the ALJ's decision to assign little weight to Dr. Reddy's opinion about Earp's functional abilities and limitations.

## V. CONCLUSION

For these reasons, the court concludes that the Commissioner's decision is supported by substantial evidence and based upon the proper legal standards. Accordingly, the decision of the Commissioner is AFFIRMED.

A final judgment will be entered separately.

DONE and ORDERED on September 26, 2019.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE